[No. D003238. Fourth Dist., Div. One. July 16, 1985.]

UNITED FARM WORKERS OF AMERICA, AFL-CIO, Petitioner, v. THE SUPERIOR COURT OF IMPERIAL COUNTY, Respondent; MAGGIO, INC., Real Party in Interest.

COUNSEL

Diana Lyons, Ellen J. Eggers, Daniel A. Garcia, Ira L. Gottlieb and Wendy Sones for Petitioner.

No appearance for Respondent.

Jay W. Jeffcoat, John Allcock, Gray, Cary, Ames & Frye, Ronald H. Barsamian, Larry Dawson and Dressler, Quesenberry, Laws & Barsamian for Real Party in Interest.

OPINION

**WIENER, Acting P. J.**—This midtrial petition for peremptory writ of mandate seeking to disqualify the trial judge (Lehnhardt) presents the interesting and sensitive question of judicial recusal under newly enacted Code of Civil Procedure sections 170.1-170.5, specifically 170.1, subdivision (a)(6)(C).[1]

---

[1]All statutory references are to the Code of Civil Procedure.

Section 170.1, subdivision (a)(6)(C), provides in relevant part as follows: "A judge *shall* be disqualified if any one or more of the following is true: . . . [that] [f]or any reason . . . *a person aware of the facts might reasonably entertain a doubt* that the judge would be able to be impartial." (Italics added.)

(Stats. 1984, ch. 1555.) We say interesting because this proceeding touches upon the core of the judicial process—the appearance of objectivity of the decision maker—requiring a careful balancing of the affected interests. Our decision must consider both the public's right to be assured of the fair, but yet efficient, resolution of disputes and the parties' right to a decision based upon the court's objective evaluation of the facts and law. (See *In re United States* (1st Cir. 1981) 666 F.2d 690, 694.) The tension between the appearance of fairness and efficiency should be self-evident. The difference between the appearance of fairness generally and the perception of fairness as seen by a party or his or her counsel should also be self-evident. With ever-mounting litigation, judicial disqualification will undoubtedly continue to increase since judge shopping before trial is now a way of life. We also suspect that judicial disqualification during trial will increase. This case is not the vehicle either to criticize or to condone such litigation tactics, we understand a particular judge's personality can "make a world of difference when it comes to rulings on evidence, the temper of the courtroom, the tolerance for a proffered defense, and the like." (*Chandler* v. *Judicial Council* (1970) 398 U.S. 74, 137 [26 L.Ed.2d 100, 137-138, 90 S.Ct. 1648] (dis. opn. of Douglas, J.).) Nonetheless the proper performance of judicial duties does not require a judge to withdraw from society and live an ascetic, antiseptic and socially sterile life. Judicial responsibility does not require shrinking every time an advocate asserts the objective and fair judge *appears* to be biased. The duty of a judge to sit where not disqualified is equally as strong as the duty not to sit when disqualified. (See *Laird* v. *Tatum* (1972) 409 U.S. 824 [34 L.Ed.2d 50, 93 S.Ct. 7], memorandum of Rehnquist, J. at p. 837.) On the facts of this case, we deny the writ.

I

Maggio, Inc. real party in interest, sued the United Farm Workers of America, AFL-CIO (UFW) for substantial damages arising out of union activity in connection with a strike in early 1979.

The case started March 5, 1985. Four weeks were devoted to jury selection. Counsel energetically conducted voir dire to eliminate those jurors who could not be impartial because of their strike views. Eventually, the parties gave up, waived jury and stipulated on March 27, 1985, to a court trial before Judge Lehnhardt. On May 24, 1985, in what UFW's petition alleges to be "an informal off-the-record conversation," Judge Lehnhardt mentioned to UFW counsel that his wife had volunteered for and worked two to three days as a replacement worker in a carrot shed owned by Maggio.

On May 30, 1985, the UFW moved to disqualify Judge Lehnhardt.[2] The motion recited: "Judge Lehnhardt failed to disclose that his wife had worked as a strikebreaker for the Plaintiff, during the 1979 strike . . . . Said failure to disclose prevented Defendant from exercising an informed CCP § 170.6 peremptory challenge, and caused Defendant to make an uninformed waiver of Defendant's constitutional right to a jury trial. The undisclosed facts, as well as the failure to disclose those facts would cause a person to reasonably entertain a doubt that Judge Lehnhardt would be able to be impartial in this case." The motion attached a "Declaration and Argument of Jay D. Gould," a UFW lawyer, which repeats Judge Lehnhardt's statement and urges disqualification based on Judge Lehnhardt's failure to disclose his wife's activity and the fact of the work itself.

Also attached to the motion was a supporting declaration by Cesar Chavez, president of the UFW, who averred he had been told of Mrs. Lehnhardt's work for Maggio and had the union known of this at the commencement of trial, the union would not have waived jury.

Also attached was a joint declaration of 10 persons identifying themselves as farmworkers represented by the UFW, averring they were aware the lawsuit sought money from the UFW because of the 1979 vegetable strike and were aware the UFW allowed Judge Lehnhardt to determine that issue. The declaration then recited: "We have learned that Judge Lehnhardt recently told our attorneys that his wife worked as a strikebreaker for Mr. Maggio during the strike.

"Because Judge Lehnhardt failed to tell us about his wife's employment, and because his wife worked for Mr. Maggio we do not believe that Judge Lehnhardt will be impartial.

"We further believe that if Judge Lehnhardt decides that our Union should pay money to Mr. Maggio, the Judge's decision may be based on his wife's relationship to Maggio.

"We believe that Judge Lehnhardt should have told our attorneys about his wife before the trial started.

"We have spoken to many members of our community and they have expressed the same concern about whether Judge Lehnhardt would be impartial in this case."

---

[2]The papers filed by the UFW were styled a "Petition for Disqualification." To avoid confusion between the petition for writ of mandate which is before us and the petition for disqualification which was before the trial court, we refer to the disqualification petition as a "motion."

Judge Lehnhardt denied the motion and it was therefore referred to Judge Chaille by agreement of the parties. (See § 170.3, subd. (c)(5).) Judge Lehnhardt filed a responsive declaration and answer in which he explained that he had forgotten about his wife's work in Maggio's carrot shed until some testimony at trial regarding replacement workers refreshed his recollection.

Judge Chaille advised the parties the disqualification motion would be decided based "entirely on the declarations submitted by [the UFW] and Judge Lehnhardt." (See generally Garcia v. Superior Court (1984) 156 Cal.App.3d 670, 677-678 [203 Cal.Rptr. 290], quoting Bixby v. Hotchkis (1945) 72 Cal.App.2d 368, 373-374 [164 P.2d 808].) He found Mrs. Lehnhardt did work for Maggio for two days in 1979, Judge Lehnhardt had forgotten the incident and, after 32 days of trial, then remembered and called it to the attention of counsel. Judge Chaille concluded: "[T]here is no evidence that Judge Lehnhardt had anything to do with the 2-day workday [sic] of his wife and he knew about it at the time and I fail to see in modern society where this would advocate any impropriety or influence the judge might feel in deciding this case.

"The court specifically finds there is no reason why a person would reasonably entertain a doubt that the judge would be unable to be impartial because six years ago the judge's wife worked for plaintiff for a period of two days." Following Judge Chaille's ruling, the UFW filed this petition for writ of mandate.

## II

In 1984, sections 170, 170a and 170.1 regarding disqualification of judges for bias or cause were replaced by sections 170.1-170.5. (Stats. 1984, ch. 1555.) Support for the newly enacted statute came from the California State Bar whose Committee on Administration of Justice drafted the initial provisions. For the most part, the revision was an effort to clarify and simplify the previous law by adding concepts and language from the Code of Judicial Conduct prepared by a special ABA committee chaired by former Chief Justice Traynor (Traynor Code) in 1972 and adopted by the California Judges Association in 1975.

### A

We are unaware of any cases attempting to interpret and apply the new section 170.1. As noted, however, it was based on concepts contained in the Traynor Code which includes a provision analogous to subdivision

(a)(6)(C), requiring disqualification of a judge where "his impartiality might reasonably be questioned." (ABA Code of Jud. Conduct, canon 3C.) This objective approach to the question of judicial partiality also served as the genesis for a corresponding federal statute, 28 United States Code section 455(a) adopted by Congress in 1974, which provides that "[a]ny . . . judge . . . shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. . . ." (See generally *State of Idaho* v. *Freeman* (D.Idaho 1981) 507 F.Supp. 706, 717-719.)

Section 170, which introduces the disqualification statutes, is a new section expressing the proposition we noted earlier that "[a] judge has a duty to decide any proceeding in which he or she is not disqualified." The legislative history shows this section was prompted by statements suggesting that certain judges did not believe they had such a duty. (See *Olson* v. *Cory* (1980) 27 Cal.3d 532, 576-578 [178 Cal.Rptr. 568, 636 P.2d 532].) Thus, the section serves to remind judges of their duty to hear cases which are controversial and might subject them to public disapproval as well as to protect them from public criticism by a clear statement of their responsibility.

For our purposes, the key change in the new statutes is found in subdivision (a)(6)(C) of section 170.1 which provides for disqualification whenever a judge's impartiality might reasonably be questioned. (*Ante,* fn. 1.) This subdivision changes the law in that the previous corresponding statute, section 170, subdivision (a)(5) (repealed by Stats. 1984, ch. 1555, § 1), which could be read as applying to the appearance of bias, had been construed to require bias in fact. (*Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 792-793 [171 Cal.Rptr. 590, 623 P.2d 151].) The reason given for the change is the difficulty in showing that a judge is biased unless the judge so admits. In addition, public perceptions of justice are not furthered when a judge who is reasonably thought to be biased in a matter hears the case.

While the language in the federal statute and the Traynor Code is virtually identical, subdivision (a)(6)(C) is couched in the somewhat different terms of "a person aware of the facts . . . reasonably entertain[ing] . . . doubt[s]" regarding the judge's impartiality. This slightly different gloss on the Traynor Code concept appears to be derived from—or at least closely tracks—interpretive language in a number of federal cases. Illustrative is the Fifth Circuit Court of Appeals' decision in *Potashnick* v. *Port City Const. Co.* (5th Cir. 1980) 609 F.2d 1101, 1111 [54 A.L.R.Fed. 825]: "Use of the word 'might' in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances,

would harbor doubts about the judge's impartiality." (See also, e.g., *United States* v. *Ferguson* (S.D.N.Y. 1982) 550 F.Supp. 1256, 1260 ("whether a reasonable member of the public at large, aware of all the facts, might fairly question the Court's impartiality").) The language apparently had its genesis in the Reporter's Notes to the Traynor Code. (See Note, *Disqualification of Judges and Justices in the Federal Courts* (1973) 86 Harv.L.Rev. 736, 745.) Thus, absent California precedent on point, we may profitably look to federal cases interpreting section 455(a) for guidance in distilling some basic principles.

The standard for disqualification provided for in subdivision (a)(6)(C) of section 170.1 is fundamentally an objective one. It represents a legislative judgment that due to the sensitivity of the question and inherent difficulties of proof as well as the importance of public confidence in the judicial system, the issue is not limited to the existence of an actual bias. Rather, if a reasonable man would entertain doubts concerning the judge's impartiality, disqualification is mandated. "To ensure that the proceedings appear to the public to be impartial and hence worthy of their confidence, the situation must be viewed through the eyes of the objective person." (*In re United States, supra,* 666 F.2d at p. 694; see also *Matter of Searches Conducted on March 5, 1980* (E.D.Wisc. 1980) 497 F.Supp. 1283, 1290.) While this objective standard clearly indicates that the decision on disqualification not be based on the judge's personal view of his own impartiality,[3] it also suggests that the litigants' necessarily partisan views not provide the applicable frame of reference. (See *United States* v. *Cowden* (1st Cir. 1976) 545 F.2d 257, 265; *Union Independiente* v. *Puerto Rico Legal Services* (D.P.R. 1982) 550 F.Supp. 1109, 1111.) Rather, "a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street." (*Potashnick* v. *Port City Const. Co., supra,* 609 F.2d at p. 1111; accord *United States* v. *Ferguson, supra,* 550 F.Supp. at p. 1260.)

Various factors may impact on how the "average person on the street" views a judge's participation in a case. One court has perceptively recognized that all other things being equal, the need for disqualification decreases by the extent to which the judge's rulings in the case are limited to purely legal matters. (*State of Idaho* v. *Freeman, supra,* 507 F.Supp. at p. 728.) This is because a trial judge's factual findings are generally accorded considerable deference whereas legal rulings are subject to plenary appellate

---

[3]Consistent with this principle, subdivision (c)(5) of section 170.3 provides: "No judge who refuses to recuse himself or herself shall pass upon his or her own disqualification . . . . In every such case, the question of disqualification shall be heard and determined by another judge . . . ."

review. (*Ibid.;* see generally *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1023-1025 [213 Cal.Rptr. 712].) Equally significant, the circumstances giving rise to suspicions of partiality rarely involve the legal posture of the case.

■ It is also important to note, especially in the context of the present case, that the facts and circumstances bearing on the judge's possible partiality must be considered as of the time the motion is brought. "The standard . . . is whether a reasonable person knowing all of the facts and looking at the circumstances *at the present time* would question the impartiality of the Court." (*Matter of Searches, supra,* 497 F.Supp. at p. 1291, italics added.)

B

■ Because the factors in the present case do not point consistently either in favor of or against disqualification, we regard this as a very close issue. On one hand, the circumstances relied upon by the UFW in support of the motion do not involve Judge Lehnhardt directly. Rather, he is suspected because of his wife's activity. Whatever may have been true in years past, it is now simply impossible and unwarranted to treat women as mere shadows of their husbands' identities. Judge Chaille's denial of the disqualification motion was based in large part on his understanding of this fact: "We do not live in colonial days where women's employment is determined by men. . . . [W]omen [do not] have to have the consent of their husbands to do things."

We recognize that other parts of the disqualification statute refer to the involvement of a judge's spouse. But those references are in the context of parties or lawyers in the proceeding (§ 170.1, subds. (a)(4) and (5)), the spouse's financial interests (*id.,* subd. (a)(3)) or the spouse as a material witness (*id.,* subd. (a)(1)). Here the UFW cannot rely on any continuing relationship between Maggio and Mrs. Lehnhardt giving rise to any current personal or financial interest which would disqualify Judge Lehnhardt. Rather, it must necessarily suggest that Mrs. Lehnhardt's willingness to work for two days during the strike would cause a reasonable person to infer that Judge Lehnhardt would either favor Maggio or be biased against the union.[4] This despite the fact there is no evidence that Mrs. Lehnhardt was in any

[4]The UFW's characterization of Mrs. Lehnhardt as a "strikebreaker" (*ante,* p. 101) may be intended to suggest something regarding the motivation for her working in Maggio's carrot shed. We wish to emphasize that the record is devoid of any evidence as to what motivated Mrs. Lehnhardt and our resolution of this issue draws no inferences as to why she chose to work for Maggio during the strike.

way involved in any of the events at issue in the underlying lawsuit. We will not belabor the tenuousness of the proffered inference.

On the other hand, Judge Lehnhardt is *the* factfinder in the case. His influence is not limited to reviewable legal rulings. He will decide the case. By virtue of his wife's actions, Judge Lehnhardt's experience with the strike was perhaps more personal than others'.[5] It is impossible to say how subtly such an experience might color his view of the facts presented at trial.

## C

We are, of course, bound by Judge Chaille's factual findings regarding the circumstances of Judge Lehnhardt's failure to bring the underlying facts to the attention of counsel until nearly two months into the trial. Judge Chaille found that Judge Lehnhardt had forgotten about his wife's work for Maggio and only remembered it when some testimony during the trial refreshed his recollection. We do not doubt the sincerity of the UFW's representations that had it known of Mrs. Lehnhardt's work before trial, it either would have exercised a section 170.6 peremptory challenge of Judge Lehnhardt or would not have waived its right to a jury.[6] Nonetheless, absent some misconduct on the judge's part which is not present here, such intentions must be deemed irrelevant when the trial is two months old and the disqualification of the trial judge is governed exclusively by sections 170.1 through 170.3. Were the rule otherwise, a party perceiving its fortunes at trial waning might often claim discovery of a fact which changed its perceptions regarding the advisability of peremptorily challenging the trial judge or waiving a jury.

Finally, Judge Lehnhardt's conduct of the trial until now must be considered as evidence of his impartiality.[7] Despite 32 days of administering the proceedings, ruling on objections, etc., the UFW fails to cite a single instance of Judge Lehnhardt's conduct which would support an inference of

---

[5] We qualify this observation by noting that Imperial County is a small, closely knit community economically dependent on agriculture. It may be virtually impossible to find county residents who were not personally affected to a greater or lesser extent by the strike.

[6] As we have noted, the partisan litigant emotionally involved in the controversy underlying the lawsuit is not the disinterested objective observer whose doubts concerning the judge's impartiality provide the governing standard. (*Ante,* p. 104.) For this reason, the farmworkers' declaration expressing concern regarding Judge Lehnhardt, while undoubtedly sincere, is of little persuasive force. In addition, their statements regarding the sentiments of "many members of our community" must be treated as inadmissible hearsay. (*Ibid.*)

[7] We have viewed the economic aspects of the case—in terms of the parties' and court's expenditure of time and resources—as weightless. While the waste of eight trial weeks would be unfortunate, the parties' right to a fair trial cannot be compromised by such considerations.

partiality. (Compare *In re United States, supra,* 666 F.2d at p. 697, where a party sought disqualification of a judge for retrial and pointed to specific rulings in the first trial which it suggested were the product of bias.) While it is true that with the enactment of the new section 170.1, a party seeking disqualification no longer need prove the judge is actually biased, we believe that reasonable persons viewing "[all] the circumstances at the present time" (*ante,* p. 105) would be much less likely to question a judge's impartiality if they knew the judge had already impartially presided over eight weeks of trial. The proof, as they say, is in the pudding.

The petition for mandate is denied.

Butler, J., and Lewis, J., concurred.

Petitioner's application for review by the Supreme Court was denied October 3, 1985. Bird, C. J., did not participate therein.